UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| NATHAN J. MUELLER,<br><br>                    Plaintiff,<br><br>     v.<br><br>CORRECTIONS CORPORATION OF AMERICA, Inc., a foreign corporation; CCA WESTERN PROPERTIES, INC., an Idaho corporation; PHILIP VALDEZ, individually and in his official capacity; JOHN and JANE DOES 1-8, in their individual and official capacities,<br><br>                    Defendants. | Case No. 1:11-cv-00057-CWD<br><br>**MEMORANDUM DECISION AND ORDER** |

Currently before the Court in this prisoner civil rights matter is Defendants' Motion To Dismiss. (Dkt. 9.) Plaintiff has responded to the Motion (Dkt. 15), Defendants have submitted a Reply (Dkt. 16), and the matter is now ripe. The parties have consented to a United States Magistrate Judge conducting all proceedings, in accordance with 28 U.S.C. § 636(c). (Dkt. 14.)

The Court finds that the decisional process would not be aided by oral argument, and it will resolve this matter after consideration of the parties' written briefing. D. Idaho L. Civ. R. 7.1(d). For the reasons set forth below, the Court will grant Defendants' Motion, and Plaintiff's Complaint will be dismissed.

**MEMORANDUM DECISION AND ORDER - 1**

# BACKGROUND

At all relevant times, Plaintiff was incarcerated at the Idaho Correctional Center (ICC), a prison operated by the Corrections Corporation of America (CCA) under a contract with the state of Idaho. (Dkt. 1.)

Plaintiff alleges that he was initially a member of a gang at ICC but that he later disassociated himself from the gang. (*Id*. at ¶ 14.) Plaintiff contends that ICC staff knew that he would be in substantial danger if he were placed in the same area as members of his former gang. (*Id*. at ¶¶ 15-16.) Despite this knowledge, on March 1, 2010, ICC staff failed to prevent gang members from being housed on the same unit as Plaintiff, and he was seriously injured in an assault by two other inmates. (*Id*.) He claims that the assault was part of a larger pattern or practice of deliberate indifference to inmate safety at ICC. (*Id*. at ¶ 11, a-g.)

In his Complaint, Plaintiff alleges five causes of action: two counts of negligence under state law (for the failure to protect him from harm and the failure to provide adequate medical care); two counts of gross negligence/recklessness under state law, based on willful, wanton, or reckless conduct (for the failure to protect him from harm and the failure to provide adequate medical care); and one count arising under 42 U.S.C. § 1983, in which he alleges that prison officials "have enacted, pursued, acquiesced in, and/or implemented policies and practices" that violated his Eighth Amendment rights. (Dkt. 1, pp. 7-12.)

Defendants have filed a Motion to Dismiss on the ground that Plaintiff failed to

exhaust the prison's administrative review process as to any current claim before filing his Complaint. (Dkt. 9.) The matter is fully briefed, and the Court is prepared to issue its ruling.

## STANDARD OF LAW

**1.     The Exhaustion Requirement**

Because Plaintiff has raised one federal claim under 42 U.S.C. § 1983 and four related state law causes of action, Defendants' Motion to Dismiss implicates the exhaustion requirements of both federal and state law.

Specifically, the federal Prison Litigation Reform Act (PLRA) requires pre-complaint exhaustion of administrative remedies for all federal claims brought by state prisoners who challenge the conditions of their confinement: "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other federal law, until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court." *Jones v. Bock*, 549 U.S. 199, 211 (2007). This requirement is intended to give "prison officials an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into court." *Id*. at 204.

Under the PLRA, proper exhaustion is also required, meaning that "a prisoner must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a precondition to bringing suit in federal court." *Woodford v. Ngo*, 548 U.S. 81, 88 (2006). "The level of detail necessary in a grievance to

**MEMORANDUM DECISION AND ORDER - 3**

comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." *Jones*, 549 U.S. at 218.

Likewise, Idaho law contains a similar requirement that prisoners must exhaust administrative remedies before proceeding with civil lawsuits:

> Unless a petitioner who is a prisoner establishes to the satisfaction of the court that he is in imminent danger of serious physical injury, no petition for writ of habeas corpus *or any other civil action* shall be brought by any person confined in a state or county institution, or in a state, local or private correctional facility, *with respect to conditions of confinement* until all available administrative remedies have been exhausted.

Idaho Code § 19-4206(1) (emphasis added). The Idaho Court of Appeals has interpreted this statutory provision as requiring exhaustion for all civil actions that are related to conditions of confinement, including tort claims. *Drennon v. Idaho State Corr. Inst.*, 181 P.3d 524, 526, 530 (Idaho Ct. App. 2007). Moreover, like the PLRA, the Idaho requirement mandates that the prisoner meet procedural deadlines to exhaust his administrative remedies properly. *Butters v. Valdez*, 241 P.3d 7, 12 (Idaho Ct. App. 2010) (relying on federal law interpreting 42 U.S.C. § 1997e(a)).

In the Ninth Circuit, a claim that a prisoner failed to exhaust administrative remedies is an affirmative defense that should be brought as an unenumerated motion to dismiss under Rule 12(b) of the Federal Rules of Civil Procedure. *Wyatt v. Terhune*, 315 F.3d 1108, 1119 (9th Cir. 2002). Defendants have the burden to plead and prove exhaustion failures, and the reviewing court may look beyond the pleadings to resolve

disputed issues of fact, if necessary. *Id*.

 2.    **ICC's Grievance Process**

Although it is a privately-run prison, ICC follows the same three-step administrative grievance procedure that the Idaho Department of Correction uses, which requires a prisoner to submit an informal concern form describing the problem, followed by the filing of a formal grievance, and an appeal of any adverse decision. (Dkt. 9-2, Affidavit of Chester Penn at ¶ 9.)

The prisoner begins this process by routing the concern form to the staff member most capable of addressing the problem. (Penn Aff., ¶ 12.) If the issue is not resolved, the prisoner must then complete a grievance form and file the grievance within 30 days of the incident. (*Id*. at ¶ 13.) The grievance form must contain specific information regarding the nature of the complaint, including the dates, places, names, and how the offender has been adversely affected. (Id. at ¶ 14.) The "grievance coordinator" at the prison will route a properly completed grievance to the appropriate staff member, who must respond within 10 days. (*Id*.)

After the staff member responds, the grievance coordinator forwards the grievance to the "reviewing authority," usually the deputy warden, who reviews the prisoner's complaint and the staff member's response and issues a decision. (*Id*. at ¶ 14.) If the prisoner is dissatisfied with the reviewing authority's decision, he may then appeal within 5 days to the "appellate authority," which is usually the facility head. (*Id*. at ¶ 15.) Once the appellate authority has issued its decision, the grievance is routed back to the inmate,

**MEMORANDUM DECISION AND ORDER - 5**

thus concluding the administrative review process. (*Id*.)

## DISCUSSION

In support of their Motion, Defendants have submitted an affidavit from Chester Penn, the grievance coordinator at ICC and the custodian of ICC's grievance records. (Dkt. 9-2, Penn Aff.) Penn indicates that he has reviewed the grievance records and found no record of a completed grievance by Plaintiff related to the prison's alleged failure to protect him from the March 1, 2010 assault or related to inadequate medical care following the assault. (*Id*. at ¶ 23.) Based on Penn's affidavit, Defendants argue that Plaintiff failed to exhaust the proper administrative channels at ICC before filing this lawsuit.

Plaintiff appears to concede that he did not complete all levels of the grievance procedure related to these claims, but he argues (1) that he was prevented from doing so because prison staff did not respond to two grievances that he attempted to submit while he was in a segregated housing unit, and (2) that he attempted to use an alternative route for bringing these issues to the attention of prison officials in his DOR proceeding and appeals. The Court does not find either point to have merit on the evidence before it.

**1.     There is No Credible Evidence that Plaintiff Attempted to File Timely Grievances**

Plaintiff initially contends that, after he was placed in segregation, he wanted to file a grievance related to "CCA's staff's failure to act to protect [him] from attack" and for giving him an improper DOR for "fighting." (Mueller Aff. at ¶ 15-16.) He claims that

**MEMORANDUM DECISION AND ORDER - 6**

correctional officers gave him a grievance form with instructions to fill it out and place it in a bean slot in the door of the segregation unit. (*Id*. at ¶ 16.) According to Plaintiff, he followed those instructions, and the form was gone the next day, but he received no response. (*Id*. at 18.) About one and a half weeks later, Plaintiff filled out a second grievance form, and a correctional officer told him the second grievance had been given to the employee in charge of processing grievances, Ms. Armfield. (*Id*. at ¶ 22-23.) He later asked Ms. Armfield about the status of his complaints, but she allegedly brushed him off without an explanation. (*Id*. at ¶ 24.) He suggests that prison staff intentionally or negligently failed to route the grievance to the grievance coordinator.

Plaintiff is correct that, when prison officials prevent an inmate from using the correct channels to route an internal complaint, an administrative remedy that may be theoretically in place will not be available to the inmate as a practical matter, and the failure to adhere to the prison's technical requirements may be excused in a later civil rights lawsuit. *Nuñez v. Duncan*, 591 F.3d 1217, 1226 (9th Cir. 2010); *see also Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006). But the Court does not find Plaintiff's claims of official interference to be credible in this case.

Initially, Plaintiff has not offered any evidence to corroborate his claims, and such evidence should be available to him. According to Chester Penn, an inmate who is held in segregation must request correctional officers to provide him with blank inmate concern forms and grievance/appeal forms, which come in a carbon-copy format with three parts. (Dkt. 16-1, Second Affidavit of Chester Penn at ¶ 6.) After an inmate completes either a

**MEMORANDUM DECISION AND ORDER - 7**

concern form or a grievance form, the "inmate copy" is then peeled off for the inmate's own records and the original and staff copies are provided to the officers for filing. (*Id*.)

In their Reply, Defendants argue that an inmate in Plaintiff's position who was concerned about grieving issues stemming from an assault would have kept the inmate copy of any grievance for his own records, particularly after he had received no response to an earlier grievance and was growing increasingly concerned. The Court gave Plaintiff leave to respond to this argument, but he did not avail himself of that opportunity. (Dkt. 18.) To date, he has neither produced inmate copies of the grievances that he claims he filled out on these subjects, nor has he offered any explanation for why he may not have those copies in his possession.

Moreover, other contemporaneous documentary evidence undermines Plaintiff's assertion that he was intent on grieving these issues in a timely manner. While Plaintiff has not produced copies of any *grievance* forms, he has supplied the Court with copies of three offender *concern forms* that he completed at the end of March and the beginning of April of 2010. (Dkt. 15-1, Exhibits A, B, C.) In the first two forms, dated March 29 and April 3, Plaintiff complains about how he did not receive his paperwork on his DOR in a timely manner so that he could appeal the findings. (*Id*. at Exhibits A, B.) In neither of these forms does Plaintiff complain that officers failed to protect him from an assault or provide him with post-assault medical care. It is not until the third form, dated April 4, that Plaintiff raises the failure to protect issue, somewhat obliquely, by accusing a correctional officer of not responding to an attack quickly enough. (*Id*. at Exhibit C.)

**MEMORANDUM DECISION AND ORDER - 8**

The existence of these concern forms weighs against a finding in Plaintiff's favor on the arguable official interference. First, they show that he knew how to bring complaints to the attention of prison staff through the proper channels and that he understood that he should retain a copy of completed forms for his own records. Next, while Plaintiff now contends that he was growing concerned about the lack of a response from prison staff to his grievances, he does not mention that concern in any of the forms that he completed during the relevant time frame, including the form dated April 4. There is also no record that Plaintiff followed up on the April 4 concern form with a completed grievance.

Although the Court does not doubt that grievances can be lost or destroyed, the record simply does not support such a conclusion in this case. Therefore, the Court is persuaded by Defendants' argument that, at most, Plaintiff began the administrative review process with the untimely April 4 offender concern form, but that he did not complete any formal steps beyond that related to these claims.

**2.  The DOR Process Did Not Provide an Alternative Administrative Remedy**

Plaintiff also contends that he would have raised his complaints about the prison's failure to protect him from harm in an appeal from his DOR hearing, but that "due to the negligent actions of the Defendants, [Plaintiff] did not receive his DOR appeal documents in time to appeal the DOR (despite submitting multiple concern forms to that extent)." (Dkt. 15, p. 10.)

Plaintiff's claim that he was unable to complete an appeal is contradicted by the

**MEMORANDUM DECISION AND ORDER - 9**

documents that Defendants have submitted with their Reply. (Dkt. 16-1.) Defendants have provided a copy of the completed DOR appeal form, in which Plaintiff argued that he should not have been found guilty because he was attacked, did not engage in mutual combat, and did not injure the other parties. (Dkt. 16-1, p. 10.) Essentially, Plaintiff was contesting the factual basis for the DOR charge. Setting aside the question of whether the DOR process – rather than the grievance system – could be a proper forum in which to raise "failure to protect" issues in some circumstances, the Court nonetheless finds that Plaintiff did not raise those issues in this instance. (*Id*.)

It is for that reason that Plaintiff's case is unlike *Riggs v. Valdez*, 2010 WL 4117085 (D. Idaho 2010). In *Riggs*, Chief Judge Winmill allowed some prisoners to proceed on failure to protect claims that they had raised in the DOR appellate process, but only after finding that the grievance system was unavailable to those prisoners as a practical matter because: (1) certain prisoners had attempted to file grievances raising failure to protect claims but were told to proceed through the DOR process; (2) the failure to protect claims were so closely tied to the events that formed the basis of the DOR charges that the distinction between them was "exceedingly subtle"; (3) the prisoners were reasonably led to believe that the DOR process was the only forum in which they could raise all claims; and (4) the prisoners actually raised failure to protect issues in their DOR appeals. *Id*. at *8-10. On those facts, Chief Judge Winmill concluded that the prisoners had sufficiently alerted officials to the nature of their claims through the only avenue of relief that was available to them, which was the DOR process. *Id*. at 11.

**MEMORANDUM DECISION AND ORDER - 10**

Here, in contrast, the Court is not persuaded that the grievance procedure was unavailable to Plaintiff or, even if it was not available, that Plaintiff actually raised any conditions of confinement, failure to protect, or inadequate medical care issues in his DOR appeal. His case is therefore distinguishable from *Riggs*, and it affords him no relief.[1]

Accordingly, the Court concludes that Defendants have carried their burden to show that Plaintiff failed to exhaust his administrative remedies before filing this lawsuit. The Motion to Dismiss will be granted.

## ORDER

IT IS ORDERED that Defendants' Motion to Dismiss (Dkt. 9) is GRANTED, and the Complaint is DISMISSED without prejudice.

DATED: March 9, 2012

Honorable Candy W. Dale
United States Magistrate Judge

---

[1] If anything, Plaintiff's situation is more analogous to the one plaintiff, Rocha, in *Riggs* who was not allowed to go forward because Rocha "did not make a good faith effort [in his DOR appeal] to alert prison officials to the facts comprising any current claim." *Id*. at *11.

**MEMORANDUM DECISION AND ORDER - 11**